## National Enameling & Stamping Company v. William Kinder.

1.  PEREMPTORY INSTRUCTION—*when should be refused.* A peremptory instruction asked by the defendant should be refused where there is evidence tending to show the plaintiff's right to recover.

2.  DEFECTIVE MACHINERY—*what sufficient proof of.* It is not necessary that a servant seeking to recover because of defective machinery should prove what particular fault or imperfection caused the improper working of such machinery; it is enough that it did so improperly operate, if the master knew of it; such improper operation is in itself a defect.

Action on the case for personal injuries. Appeal from the Circuit Court of Madison County; the Hon. BENJAMIN R. BURROUGHS, Judge, presiding. Heard in this court at the August term, 1905. Affirmed. Opinion filed March 22, 1906.

WISE & McNULTY, for appellant.

M. R. SULLIVAN and KEEFE & SULLIVAN, for appellee.

MR. JUSTICE CREIGHTON delivered the opinion of the court.

This was an action in case in the Circuit Court of Madison County, by appellee against appellant, to recover for a personal injury sustained by appellee while engaged in the service of appellant in operating one of its machines used in making rice boilers.    Trial by jury.    Verdict and judgment in favor of appellee for the sum of $1,999.

The declaration consists of two counts.    The first charges that a particular specified part of the machine was out of repair.    The second, as abstracted by counsel for appellant, is as follows :   The second count, omitting the formal parts, states that the machine was operated by placing a utensil in the die, and the operator placing his foot upon the treadle, by which act the die would descend and press the utensil into the desired form, then ascend several inches above the impact, and remain until the operator worked the treadle.    That the machine was in a defective condition, *in that the die would descend without being caused so to do by the operator.* That it was the duty of the defendant to use reasonable care to see that the machine furnished plaintiff was in a reasonably safe condition, and to warn him of the dangers connected with his employment, which were unknown to the plaintiff, and which could not be ascertained by the plaintiff, but the defendant carelessly directed the plaintiff to use and operate said machine in its defective condition, which defective condition should have been known to the defendant by the use of ordinary care a sufficient time before the injury to have enabled the defendant to have repaired the machine.    That the plaintiff was inexperienced and unable to realize the danger of operating said machine, and by reason of this inexperience, when the plaintiff was ordered to work upon the machine, he did not know of the defective condition of the machine, nor the danger likely to follow the operation of said machine in its defective condition, and while in the exercise of care and caution, and

while engaged in removing a utensil that had been pressed into form, the die suddenly descended *because of the defective condition of the machine as aforesaid*, and cut off portions of all the fingers of plaintiff's left hand, to the damage of the plaintiff in the sum of $1,999.

At the close of plaintiff's evidence and again at the close of all the evidence, the defendant (appellant) moved the court to direct a verdict in its favor. The refusal of the trial court to grant this motion presents the only question raised and argued on this appeal.

"It is well settled in this state, that an instruction to the jury to find a verdict for the defendant should be refused where there is evidence tending to show the plaintiff's right to recover." Langraf v. Kuh, 188 Ill. 484.

Appellant was engaged in the manufacture of various kinds of household utensils, among which was one called a rice boiler, and had in use in its plant a machine denominated a "bulging press" for putting collars on such boilers. This machine had an upper and lower die, made of iron. The lower die was stationary, having a hole in it, in which the boiler was placed for the purpose of being "bulged" for the collar. The upper die weighed three or four hundred pounds and when in operation was raised eight or ten inches and allowed to drop into the lower die containing the boiler, and by the impact the boiler would be bulged. The power in use in the plant was steam and this machine was propelled by means of a belt over a pulley and was so constructed that, although the belting and wheels of the machine were all the time in motion, the upper die would remain stationary at the top until released by means of pressing a treadle, when it would drop into the die below and return to the top and remain there, until again released by pressure on the treadle. But in case the pressure remained on the treadle the die upon reaching the top would immédiately drop again and continue to do so, over and over, until the pressure would be removed from the treadle.

The mode of operating this machine was for the oper-

ator to place a boiler in the hole in the lower die while the upper die was at rest at the top, press the treadle with his foot, thus causing the upper die to drop, making the bulge by the impact and returning again to rest at the top. The operator would then with his hands remove that boiler and place another in position, press the treadle with his foot, the upper die would drop and again return to rest at the top, and so on again and again, as long as the machine would remain in good condition and proper repair and be properly operated.

The machine had been in use for at least four years before the date of appellee's injury, but the evidence does not disclose how long. Shortly before appellee was put to operating it, it was being operated by Mr. Luhmann, appellant's foreman of that department. Concerning the condition of the machine at that time, the helper who was passing ware to Luhmann testifies, "the machine would get hot, drag up, and knock. It was smoking between the shaft. Every short while we would have to do something with it. While Luhmann was working on it the machine fell once. The upper die fell. He had taken a boiler out and was reaching back to get another. I was standing behind him piling up the boilers. When it fell Luhmann said, 'that damn machine ain't working right,' and he took his wrench and walked around behind the machine, worked on it a little, and came back and went to work again. * * * I worked there a day and a half after it fell. * * * It did not fall any more that I saw. When the die fell Luhmann was standing on his feet; he did not have them on the treadle." One or two days after this, this same foreman put appellee to operating this machine and when he did so said to him, "Bill, watch out for this machine, it's been doing heavy work; if it don't work right come and let me know; if it gets hot up there." After appellee began to operate it, it did frequently get hot up there, and he "would tell Mr. Luhmann every time." "And Mr. Luhmann would take a wrench and go behind it and then say, 'it's all right now, Bill, go to work.'"

Appellee was first put to operating this machine on Friday, worked it half the day Friday, half the day Saturday and until 5:30 o'clock Monday, when as he was in the act of removing a boiler from the lower die the upper die fell, crushing four fingers off of his left hand.

While appellee had worked in the same department in which this machine was in operation, for a year or more, he had had no experience with this machine and no knowledge of the principles upon which it was constructed, nor of the dangers incident to its operation, other than what a casual observer would know, and that he had no knowledge of the fact that the upper die had ever fallen or that there was any danger of its ever doing so, and he received no information or warning with respect to such danger; and he had no knowledge that the machine was in any respect out of repair except what the foreman told him about its "getting hot up there," and if it didn't work right to let him know. He had neither knowledge, nor reason to suspect, nor notice, nor warning that there was any defect in the machine that would make it possible for the upper die to fall, except in response to his pressure on the treadle.

The evidence clearly proves that the machine was not in good condition, and that it was in some respect not in proper repair, and it tends to prove that this want of condition and repair did in some way cause the die to drop, and that all this was fully known to appellant, through its foreman, before and at the time he put appellee to operating it.

All the witnesses agree, and the model exhibited in the trial court and in this court demonstrates, that when the die is at rest at the top, "if the machine is in good condition and proper repair it is impossible for the die to fall without the operator's pressing the treadle." "If the spring was out of order it would fall or repeat." "If the catches on the axle were worn it would slip, and it would repeat it if slipped by both of them." Appellant's master mechanic testifies: "If the die would go up and come down without putting your foot on the treadle, then the machine

would be out of repair." The superintendent of the machine department testifies: "If the machine would repeat, of course something was the matter with it."

It is conceded that on the occasion in question, after the die had come down and done its work and gone up, it did from some cause descend and mash off the ends of appellee's fingers as he was in the act of removing the "bulged" boiler from the hole in the lower die. Under the undisputed evidence this could have occurred from but one of two causes. Either the machine was in such "defective condition that the die would descend without being caused to do so by the operator," as alleged in the declaration, or the operator caused it to descend by pressing the treadle.

Counsel for appellant contend that the proof that the machine was in good condition and proper repair is so overwhelming as to force the conclusion that the witness who said the die fell while the foreman was operating the machine testified falsely, and that appellee's testimony, to the effect that he did not press the treadle at the time he was injured, was also false. In this connection it must be borne in mind that the model exhibited in court throws no light on the state of condition or repair of the actual machine as it was at the time of the injury. The model shows the machine in a state of perfection, before it had been subjected to the strain and wear and tear of at least four years' use.

As to the condition and state of repair of the machine, William Luhmann, appellant's foreman, testified: "I am not a machinist and don't repair machines. * * * I was at the machine about ten minutes before Kinder got hurt. * * * I worked on the machine then and saw that it was all right. * * * After Kinder was hurt we looked all over the machine and could find nothing wrong with it. We then started to work the treadle and it worked good. When we pressed the treadle it came down." George Gehne testified: "I am the master mechanic of the defendant, and was when Kinder was hurt. I made an

examination of this machine right after he was injured. I found the machine in good order. I tested it about twenty-five or thirty times, by putting my foot on the treadle and letting it run, and I examined all these things here. When I pressed the treadle the die would go up and stay up. I examined the safety catches on the machine. * * * When you pressed the treadle the machine would keep on repeating. If you released the treadle it would stop. At that time it did stop on the first safety clutch." He then says: "It was not possible for the machine to have come down unless the operator pressed the treadle, because the machine was in good condition. * * * I have known the machine about four years. * * * I did not repair it within a week after appellee was injured." Theodore Dewerff testified that he worked on the machine for a little over a day, within a week after appellee was injured, and that it worked all right then, and that he saw Gehne and Luhmann testing the machine after appellee was hurt and that it worked all right then. Hugh Taylor testified that he saw Gehne and Luhmann testing the machine after appellee was hurt and that it worked all right. Theodore Neidringhaus testified that he saw the machine in operation at seven o'clock the next morning after appellee was injured; "it operated all right; every time you put your foot on the treadle it would descend and go up again and stop, where it ought to."

None of these witnesses except Gehne were machinists, and all any of them state or claim to know about it is that when they saw it being tested or in operation the die properly responded to the pressure on the treadle. While Gehne says in general terms that he examined the safety catches and "all these things here" and that he "found the machine in good order" and "the machine was in good condition," he omits to state specifically concerning the condition of the spring or that the catches on the axle were not worn, the two features of the machine that are specially designed to place the downward motion of the die under control of the operator. The whole stress is laid upon the

fact that during the few tests these witnesses made or saw made, and during the little more than a day that Dewerff operated the machine after appellee was injured, the die did not fall.    Counsel ask us to hold as a matter of law that this evidence so overwhelmingly and conclusively proves that the machine was in good condition and proper repair as to force the conclusion that the witnesses that testified that the die fell twice during four days of continuous service in the performance of actual work must have testified falsely.    In doing so we would be required to assume, as a matter of law, the credibility of all the witnesses on one side, the correctness of all their statements as to facts, and of their opinions and conclusions as well, in a case where there is contrariety and contradictory evidence. In such case the credibility of the witnesses and the proper weight to be given to the testimony of each is for the jury to determine.

In order to constitute a machine a dangerous machine, it is not always necessary that it be so defective, strained and worn as that it will fail properly to respond or act every time it is tested or every time it is operated for a day or so. A machine might be extremely dangerous, that is, so defective, that it would fail properly to act once in a very long period of time.

It is urged by counsel for appellant that in order to recover it devolved upon appellee to show affirmatively the specific defect which caused the injury, and many authorities are cited in support of this contention.    None of them are applicable to the facts of this case, in the sense that counsel seek to apply them.    Here the declaration charges " that the machine was in a defective condition, in that the die would descend without being caused to do so by the operator."    This it was necessary to prove and this the evidence tends to prove, and the jury found that the evidence did prove it.    " It is not necessary that appellant should have proved what particular flaw or imperfection caused the improper working of the machine.    It is enough that it did so improperly operate if appellant knew of it.

Such improper operation was in itself a defect." And in the case at bar was the particular defect charged in the second count of the declaration. The case of Norton Brothers v. Sezpurak, 70 Ill. App. 686, from which the above quotation is made, is a case in its every fact and feature like the case at bar. The same kind of factory, the same kind of machine, the same kind of defect, the same kind of notice, the same lack of warning, the same kind of injury caused in the same way, the same kind of proof on behalf of appellee, the same kind of defense and the same kind of evidence in support of it. The court further discussing the case says: " It is very strenuously urged by counsel for appellant that the expert evidence shows conclusively that the machine could not have been operated as indicated by the evidence for appellee. It is enough to say that the jury from the evidence believed the theory of appellee as to what was, rather than the theory of the experts as to what could not have been." In the case of Mallen v. Waldowski, 101 Ill. App. 367 (372), the court says: " The very fact that the machine worked improperly, irrespective of the cause, made it a defective machine."

Counsel say: " Another insurmountable difficulty to the recovery of appellee is the principle of law that before a recovery can be had by a servant, when he is injured by defective machinery, is that the defect must be brought to the notice or knowledge of the master a sufficient length of time to have enabled him to have taken steps to have averted the accident, or have remedied the defect." In this connection they call attention to the testimony of appellee's witness Lamar, who testified that a day or a day and a half before appellee was put to work on the machine, and while appellant's foreman was operating it the die fell, and that the foreman " went behind the machine with his wrench and did something to it," and after that it worked all right and did not fall again until appellee was injured, about four days, and they ask: " Was this any notice or knowledge that it would fall again after it had been properly repaired ? " The answer to this question is that Lamar

did not say that it was properly repaired. He did not say that it was repaired at all. He said that the foreman " went behind the machine with his wrench and did something to it." The foreman testified as to this circumstance: " I am not a machinist and don't repair machines. I did not undertake to fix the machine. * * * I did not take the wrench and fix it." There is no evidence tending to prove that the machine had been " properly repaired " at any time between the time when the die fell while the foreman was using it and the time it fell when appellee was injured.

The judgment of the Circuit Court is affirmed.

*Affirmed.*